Thomas M. Burton (USB 00518)(CSB035856)
P.O. Box 1619
Salt Lake City, Utah 84110
205 6th Avenue, Suite 5
Salt Lake City, UT 84103
(801) 918-1656

FILED
U.S. DISTRICT COURT

2012 JUN 21  P 4: 54

DISTRICT OF UTAH

BY:_____

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

|  |  |
|---|---|
| ELIZABETH VERNEY and JULIA GORDON, <br><br> Plaintiffs, <br><br> vs. <br><br> TURN ABOUT RANCH, INC. a California Corporation; ASPEN EDUCATION GROUP, INC, a California corporation; and DOE 1 through DOE 10, inclusive, <br><br> Defendants | Case: 2:12cv00590 <br> Assigned To : Waddoups, Clark <br> Assign. Date : 6/22/2012 <br> Description: Verney et al Turn About Ranch et al <br><br> **COMPLAINT FOR VIOLATION CALIFORNIA CIVIL CODE §52.1; VIOLATION OF THIRTEENTH AMENDMENT; NEGLIGENCE; BREACH OF FIDUCIARY DUTY; CONSPIRACY and FRAUDULENT CONCEALMENT; VIOLATION OF INTERNATIONAL STANDARDS FOR CARE OF CHILDREN; ACTUAL AND CONSTRUCTIVE FRAUD; BREACH OF CONTRACT/WARRANTY** <br><br> DEMAND FOR JURY TRIAL |

Come now plaintiffs Elizabeth Verney and Julia Gordon, who allege as follows:

## NATURE OF THE CASE

1.  On or about June 23, 2004, Julia Verney (now Julia Gordon) signed an

enrollment agreement with Turn About Ranch ("Ranch") in Escalante, Utah to take full and complete custody up her daughter, Elizabeth Verney, for the first 80 days of an anticipated longer stay at a prepaid cost of $310 a day.

2. The written adhesion agreement provided that Julia would sign a power of attorney transferring custody of Elizabeth for the duration of the agreement, and nevertheless accept responsibility for all expenses, damaged property, run away retrieval expenses, nursing and medical care, and release the Ranch and its employees or contractors from any liability for injury to or death of the Elizabeth.

3. The agreement gave the Ranch full authority to strip search Elizabeth by removing all of her clothing so as visually to inspect her person and body cavities. The Ranch had the right to physically control and detain Elizabeth by any restraint deemed necessary, which it did. Should she escape, the Ranch could enlist any and all enforcement agencies to capture and return her to the Ranch at Julia's expense.

4. The Ranch also had the right to use Elizabeth's name, likeness, voice, and actions in photographs, videotapes, and audiotapes, and to "dub" her voice as needed for promotional and publicity productions. The Ranch was

2

authorized to obtain medical care and records, and engage any medical, dental, psychiatric, and hospital, ambulance or other health related care at Julia's expense. The agreement gave the Ranch permission to use data from Elizabeth's records, tests, and assessments for research. The Ranch agreed that it understood that Elizabeth was a minor placed in its custody and control without her consent.

5. Later, Julia Gordon bitterly regretted sending Elizabeth to the Ranch in Utah. The consequences of her stay there had a profound adverse effect upon her life and family, with which both mother and daughter are still struggling many years later.

6. Julia Gordon only became aware that something was seriously wrong when she and her husband travelled to Utah to visit Elizabeth, half way into her 80-day initial stay at the Ranch. They were shocked to find her terrified, subdued, and very disturbing in her behavior. Her hands were raw and continuously bleeding, she had lost weight and looked exhausted. They took her out for an hour and found her paranoid, afraid that their conversation or her removing her cap would be reported to the Ranch, with dire consequences.

7. She feared retribution for anything she did, said, or thought that was not

Ranch approved. Even though she was desperate to confide in her parents, she needed, before doing so, constant reassurance that they would not go back to England without her.

8. The parents began to realize that Elizabeth's fears were well founded when they returned to the Ranch for the night and went to see Max Steward the next day. He was enraged by the parents' queries and concerns about Elizabeth's condition, and when informed that Elizabeth would be removed immediately, he threatened to withhold her passport.

9. When they finally had Elizabeth with them and were safely away, they learned that Max Steward and the staff had put Elizabeth through a humiliating denunciation session the last evening. She was also denied food that day as a final punishment.

10. The parents were shocked and outraged that the Ranch had not informed them of Elizabeth's deteriorating mental and physical condition but, to the contrary, that the Ranch had falsely said that she was thriving and wanted to extend her stay. During the 7 weeks she was away they had been in regular contact with Elizabeth, faxing letters to her daily, and spoken to the staff at the camp twice a week for an update. Contrary to fact, the Ranch had led then to believe that Elizabeth was well and happy.

4

11. They had asked to speak to Elizabeth many times, but were told by staff and the psychiatrist at the Ranch that it would distress her and disturb her excellent progress of gaining self-esteem, and that she may, given her joyous progress, wish to stay even longer after completing the program. They had received faxed letters from Elizabeth at least once a week, none of which mentioned any serious problem.  Only after coming to Utah and confronting the Ranch director and resident psychiatrist did they learn how the Ranch functioned.

12. The Ranch functioned by lying to the parents about the child's false progress and to the child about her parents' approval of the treatment she received.  Many of the parents' letters were never given to Elizabeth and her letters to them were censored.  Most of Elizabeth's daily letters never reached her parents.  The Ranch told Elizabeth that that her parents had indeed phoned the camp regularly and agreed with the camp's criticisms of Elizabeth, and did not want her to return home.  Elizabeth asked her psychiatrist to tell her parents how unhappy and afraid she was and that she wanted to come home or speak to them directly.  To the contrary, her parents were told only that Elizabeth was happy and wanted to stay at the camp even beyond her 80-day program.

5

13. Elizabeth had been subjected to almost two months of cruelty, brain washing, and abuse in an atmosphere of menacing malevolence. No explanation was adequate to justify subjecting a vulnerable frightened 15 year old girl to the systematic breaking of her spirit and mental health unless she were in the hands of sadists and psychopaths, which she was.

14. On her return to England, Elizabeth was unable to adjust and recover from her ordeal. She withdrew and could not return to school and her parents had to engage psychiatric treatment, which is still ongoing. The experience at the Ranch so traumatized Elizabeth that she found it difficult to confide in anyone as to what had happened to her there. Elizabeth was initially treated for depression and anxiety until she was diagnosed with post-traumatic stress disorder. Her therapy has been ongoing and she is currently receiving EMDR treatment.

## PARTIES

15. Elizabeth Verney is a 22 year-old single woman born on June 22 and a citizen of Great Britain, living in London, UK. Julia Gordon is the mother of Elizabeth Verney and a citizen of Great Britain, living in London, UK.

16. Turn About Ranch ("Ranch") is a California citizen and Corporation with

its principal place of business in Cupertino, California, purporting to be a

Utah licensed residential treatment center located at Escalante, Utah. It,

in turn, is a program owned and operated by Aspen Education Group, Inc.

17. Aspen Education Group, Inc. (ASPEN) is a California citizen and

Corporation with its principal place of business in Cerritos, California.

ASPEN purports to be an academic system of boarding schools providing

educational services to minors.

18. Doe defendants 1 through 10 are persons presently unknown to the

plaintiff who will be added to the complaint when their identity is

ascertained.

19. In all things herein alleged and at all times material, all defendants were

acting as agents for, or joint adventurers with, the other defendants, and

were also acting in furtherance of a conspiracy to commit the acts or

suppress the facts herein alleged.

## JURISDICTION AND VENUE

20. The Court has jurisdiction under 28 U.S.C. § 1331 for all civil actions

arising under the Constitution of the United States. Jurisdiction of this Court

is also invoked pursuant to 28 U.S.C. §1332(a)(1) for diversity of citizenship.

The matter in controversy exceeds the sum of $75,000, exclusive of interest

and costs. Jurisdiction for Plaintiffs' equitable relief is proper pursuant to 28

U.S.C. §§ 2201, 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure

and the general legal and equitable powers of this Court.

21. Venue is proper under 28 U.S.C. § 1391(b) because a Defendant is located

in this District and a substantial part of the events and omissions giving rise

to Plaintiffs" claims occurred in this District

## FACTS

22. Elizabeth spent 7 weeks as an abject captive of Turn About Ranch in 2005

when she was 15 years old. She experienced trauma and abuse, which she

describes as torture. The camp changed her life and that of her family

forever. She has suffered from post dramatic stress disorder for a number

of years on account of her experiences and never has been able to find

closure knowing that the camp is still running and other young people are

being abused, as was she.

23. Elizabeth's parents, being British Citizens, did not know the

differences between the laws of Utah and California on the one hand, and

the laws in the United Kingdom on the other hand, so they believed the

Ranch directors who told them that the consent forms they had signed

preventing any legal action against the Ranch for whatever happened to

Elizabeth while she was there.

24. Defendants told Elizabeth's that Turn About Ranch was a residential treatment facility that treated young people with low self-esteem, depression and mental health problems. The camp boasted daily private therapy sessions, horse riding and outdoor activities with all staff trained as childcare experts. Elizabeth suffered from ongoing depression and a severe anxiety disorder (among other less serious issues), which had led her parents to take her out of school a few months before she went. The Ranch confirmed that her issues fit exactly what they were trained to deal with and they would take good care of Elizabeth. That, however is not what happened.

25. During her stay Elizabeth was subjected to sleep deprivation, denied food, and yet forced to eat and prepare meat, which was abhorrent to her as a vegetarian. The Ranch threatened her with restraint and force-feeding with a tube if she did not comply, The Ranch forced physical labor and excessive exercise in extreme temperatures. It forced her regularly to put her hands in a sink filled with bleach to wash dishes until they bled, leaving to this day scars on her knuckles.

26. Staff's verbal abuse was unrelenting, humiliating both in private and in group "denunciation meetings" where she was made to list her faults and

listen to her peers taking turns denigrating her and her faults, and what they disliked about her, not as therapy but out of relish.

27. Staff regularly threatened Elizabeth with physical violence, including potential suffocation if she tried to run away. They told her daily that she was a bad person, and described her as "disgusting, stupid, manipulative, pathetic and bad". They screamed at her, punished her for crying and for having panic attacks that caused fearful hyperventilation.

28. They forced her to maintain stress positions for many hours at a time during the first few days at the Ranch, not allowing her to rest her body against any structures, to stretch or to lie down, putting great pressure on her back, neck and joints, all of which was extremely painful. They forced her to sleep on a wooden slab without a pillow or mattress even though she already suffered from ongoing back pain from an injury that her parents had told the Ranch about.

29. She was often not allowed to wash for days at a time or change her dirty clothes. They forced her to sleep in clothes that had animal feces on them.

30. Bullying and abuse between those in the program was not only overlooked but actively encouraged. When Elizabeth informed staff about a 13-year-old boy's being bullied by older teens in his dorm room, a staff member said the boy deserved it and joined the ring leaders in taunting and

humiliating her all the more, and then excluded the boy from group activities.

31. Elizabeth was also forced into "gender roles" that were humiliating and degrading.

32. She was forced to attend a church although she and her family are not Christian and found some of the teachings against her beliefs.

33. In some ways the most harmful experience was the emotional abuse inflicted by her appointed "therapist" of uncertain credentials, who criticized her, led a denunciation meeting against her, told her that she was a bad person and was "pretending" rather than suffering from true anxiety or depression, thereby refusing to treat, validate, or even acknowledge the deterioration of her mental health at the Ranch. Notwithstanding being cast as a counselor and liaison between Elizabeth and her parents, she lied to Elizabeth's family about Elizabeth's welfare and physical and mental health, and lied about her parents' communications to the Ranch about Elizabeth; and facilitated, enhanced, and concealed Elizabeth's abuse so as to dissuade her family from making serious inquiry about Elizabeth's welfare and, in order to extort further funding, claimed that Elizabeth needed to remain at the Ranch.

34. Elizabeth saw that animals at the camp were seriously abused and

neglected. She was told of animal torture witnessed by other teens, such as the burning of a live rat on a camp fire (apparently the creature was repeatedly tossed into the fire by a member of staff until it died). One staff member showed Elizabeth a knife he used to castrate farm animals without anesthetic, describing the animals screams, as he knew that she was an animal lover. Dogs were left for days without water in extreme heat with Elizabeth being the only one checking on them.

35. The Ranch intercepted, read, and confiscated Elizabeth's mail. Staff made her write false and glowing letters. Staff censored and manipulated all communication with her family. They lied to her about communications between the Ranch and her parents and vice versa. Staff told her that her parents were colluding with the Ranch to "punish" her because she was a bad person, that they did not really love her, were angry with her, and were not sure whether they were ever going to come and get her.

36. On one occasion Elizabeth had written to her parents telling them about an incident of mistreatment, the mention of which the Ranch always emphatically prohibited, and that she wanted to come home. The Ranch never sent the letter. Max, one of the Ranch directors, told Elizabeth that her parents had received the letter and not only did they think Elizabeth deserved the abuse but had called the Ranch saying that she had been

"telling tales" and should be punished for doing so. Her parents were told at this time that Elizabeth was so happy at the Ranch that she wanted to stay even longer in the program and they were encouraged to fund the extension of her time there.

37. Elizabeth had self-harmed in the past and was told by staff it was manipulative and immoral and her therapist made her apologize publically for it. Elizabeth was very shy and embarrassed about having self-harmed and found it publically portrayed as a gross sin rather than a recognized control mechanism. She was punished for crying, usually by being made to walk in circles or sit on a rock outside alone for hours at a time. Even if she cried silently or tried to conceal it by covering her face and then apologizing, she was laughed at, screamed at, and punished for being 'manipulative' or 'weak'.

38. Out of several anxiety or panic attacks, Elizabeth had one so severe, that she hyperventilated until she could not breathe, and became so dizzy that she could not stand unassisted. She was sneered at and taunted by staff and made to sit in a circle of rocks until she was able to regulate her breathing and stand up. She was then made to walk in a 15-foot circle for 3 hours as punishment for 'faking' the attack.

39. On one occasion, staff told the group of a coming inspection outside the

13

Ranch. The inmates were given new pillows and several other things within the camp were changed and improved upon, until the inspector left, when the changes quickly reverted to "normal".

40. Had Elizabeth's parents not come to visit for the half way meeting after seven weeks, she would have had another eight weeks of torture to endure. Elizabeth suffered a breakdown of some degree during her stay. She at one point stopped sleeping entirely for 3 days due to stress and began to experience panic attacks that led to hyperventilation almost daily. She became hyper alert, jumpy and paranoid and feared she was going to be killed so that she would never be able to leave. The Ranch said that her parents had signed over ALL parental rights to them and essentially given her away so that they legally could keep Elizabeth forever.

41. Elizabeth had a hard time adjusting to life when she left and had severe insomnia and night terrors. She began to drink to cope with the flashbacks and anger and helplessness she felt over what had happened to her; she battled alcoholism for several years after returning from Turn About Ranch.

42. She remembers being constantly frightened and fearing for her life, such was the level of intimidation and brain washing she experienced while there. She thought she was 'bad' on some kinetic level for such things to

have been deliberately and pathologically done to her.

43. By the time she left, she had come to believe that the things she had been told about her and that she negatively experienced at the Ranch, were the real reality, a sort of semi-Stockholm Syndrome. Until the moment they boarded the plane to the UK, Elizabeth thought that as a result of any mishap, mistake, or blunder she had made, she would be kidnapped and taken back to the Ranch.

44. It took months of support from her family before Elizabeth could recognize that what had happened was over and that her family did love her and that she was safe in England from retaliation by the Ranch. Nevertheless, she still lives with PTSD, and the damage to her self-esteem has been irreversible. There remains recrimination between Elizabeth and her parents and between her parents with one another over the effect of Elizabeth's confinement at Turn-About Ranch.

45. As described herein, at all times relevant hereto, Defendants:

a. Restrained and kept Elizabeth in constant involuntary physical confinement, with no reasonable means to escape and no choice or viable alternative except to perform services for the benefit of the Defendants.

b. Intentionally subjugated Elizabeth's will, desires and natural needs

15

to the Defendants' will and whims, including their forcing her to do
anything, whatever, whenever, and however they wanted as if she
were a caged animal.

### FIRST CAUSE OF ACTION

(Deprivation of Constitutional Rights to Due Process, Liberty and Privacy)

46. Plaintiffs hereby restate and reallege each of the foregoing paragraphs as if fully stated.

47. The Fourth, Fifth, Thirteenth, and Fourteenth Amendments to the Federal Constitution, Article I, Sections 1, 6, and 7 of the California Constitution, and Article I, Sections 1 and 7 of the Utah Constitution guarantee against encroachment Elizabeth's rights to liberty, due process, and privacy.

48. By incarcerating Elizabeth at their Utah compound for no less than 80 days as a beginning, although innocent of any crime or offense, without notice, without hearing, without consent, forcing her to divulge private information, interfering with her right to communicate freely and confidentially with her family, subverting her therapy with conflicted practitioners, abusing her physically, emotionally, and psychologically, and by depriving her of education credits, Elizabeth lost constitutionally sanctioned liberty and privacy interests.

49. Section 52.1 of the Civil Code of the State of California protects any person from private interference by threats, intimidation, or coercion with rights secured by the California and United States Constitutions and laws. California defendants have interfered with and deprived Elizabeth of her

16

Constitutional rights to liberty, due process, and privacy in violation of Section 52.1.

50. Defendants' conduct proximately caused Elizabeth personal injury and emotional distress from and after her 2004 incarceration to date.

51. Defendants' conduct subjects them to fines for each violation of no less that $4000, for attorneys fees, and punitive damages because their conduct was malicious, wanton, and in reckless disregard of Elizabeth's health, safety and welfare, by reason of which she is entitled to recover special damages, general damages, and punitive damages against them.

## SECOND CAUSE OF ACTION

(Thirteenth Amendment: Slavery)

52. Plaintiffs hereby restate and reallege each of the foregoing paragraphs as if fully stated.

53. Section One of the Thirteenth Amendment of the United States Constitution provides in pertinent part, "[n]either slavery nor involuntary servitude....shall exist within the United states or any place subject to their jurisdiction." U.S. Const. Amend. XIII, § 1.

54. Section One of the Thirteenth Amendment is self-executing, abolishing slavery and involuntary servitude without any ancillary legislation.

55. Section One of the Thirteenth Amendment prohibits the conditions of slavery and involuntary servitude without regard to the identity or age of the victim.

56. Although enacted in the historical context of African slavery, the Supreme Court has repeatedly declared that the Thirteenth Amendment is not so

limited. Because the Amendment forbids any form of slavery, it embodies a principle that can be (and over the years has been) defined and expanded by common law to address morally unjust conditions of bondage and forced service existing anywhere in the United States.

57. Moreover, our Constitutional jurisprudence is the story of the courts' interpreting, applying, and expanding Constitutional protections to new groups and circumstances. A constitutional "principle, to be vital, must be capable of wider application than the mischief which gave it birth." *Weems v. United States*, 217 U.S. 349, 373-374 (1910).

58. As described herein, Defendants were holding Elizabeth in slavery in violation of Section One of the Thirteenth Amendment by, among other things:

      a. holding Elizabeth a physical and psychological captive to the Defendants' demands and compelling her to serve their interests in exploiting money from her desperate and deluded parents;

      b. keeping Elizabeth by physical means and other coercion with no means to escape and no choice or viable alternative except to submit to each all of their demands;

      c. to perform services for the Defendants;

      d. Keeping Elizabeth separated form her home and family;

      e. Depriving Elizabeth of the ability to engage in or determine her own course of action or way of life;

    f.  Exploiting Elizabeth's vulnerabilities for the purpose of breaking down her free will, and causing her to become a compliant and mindless slave of Defendants' demented behavior modification program;

    g.  Intentionally subjugating Elizabeth's will, desires, innate drives and natural instincts to Defendants' will and whims;

    h.  Keeping Elizabeth continually and constantly confined in unnatural, stressful, and tortuous circumstances;

    i.  Forcing Elizabeth to subject herself wholly and completely to Defendants' control and to their mental, emotional, and physical demands so as to make her lose her individual identity and will.

WHEREFORE, Plaintiffs are entitled to judgment according to proof.

### THIRD CAUSE OF ACTION

(Thirteenth Amendment: Involuntary Servitude}

59. Plaintiffs hereby restate and reallege each of the foregoing paragraphs as if fully set out.

60. Section One of the Thirteenth Amendment also abolishes "involuntary servitude", a term with a broader meaning than slavery, abolishing any

state of bondage in this country, of whatever name or form.

61. While the outer limits of the common law prohibition against "involuntary servitude" are not currently established, at a minimum, and as used in this case, it involves the rights to one's own life and liberty, to labor for one's own benefit, and to be free from physical subjugation or coercion by another.

62. As described herein, and particularly regarding Elizabeth's being forced to do chores and care for animals that require constant care and nourishment, and that would require Defendants otherwise to hire someone else to do, Defendants have subjected Elizabeth to a condition repugnant to the Thirteenth Amendment's prohibition against involuntary servitude.

63. As described herein, Defendants were also holding Elizabeth in slavery and involuntary servitude in violation of Section One of the Thirteenth Amendment by, among other things:

WHEREFORE, Plaintiff is entitled to judgment according to proof.

## FOURTH CAUSE OF ACTION

### (Negligence)

64. Plaintiffs incorporate by reference all previous allegations above stated.

65. In addition to allegations of neglect, as described hereafter, the Defendants Ranch and Aspen collectively and jointly acted in breach of their duty to provide a safe, nurturing, fair, clean, competent, facility and staff to help struggling young people heal from psychological and emotional maladies troubling them.

66. The Ranch and Aspen negligently selected and placed offending directors, teachers, supervisors, and staff in positions of trust, confidence and authority and in direct, unsupervised contact with minor children, when they either had no knowledge of the directors, teachers, supervisors, and staff's backgrounds or had actual or apparent knowledge of these individuals' dangerous propensities toward physical, emotional, mental, and sexual abuse of their students.

67. Defendants failed to establish written and effective guidelines and procedures to safeguard the children entrusted to them.

68. The Enterprise failed to provide proper training to its directors, teachers, supervisors, and staff.

69. The Enterprise encouraged, through its pattern and practice, the herein described acts of wrongful and illegal conduct by its staff and employees.

70. The Enterprise failed to warn the Verneys of the offending directors, teachers, supervisors, and staff's dangerous propensities towards abuse of minor children. Indeed, it was the Enterprise's pattern and practice, and its principals' modality of practice, to encourage the abusive behavior from the directors, teachers, supervisors, staff, and other students.

71. The defendants were under a duty to disclose the extent of the problem of

physical, emotional, mental, and gender abuse by the directors, teachers,
supervisors, and staff towards minors such as Elizabeth, and the severe
psychological problems that would result from such abuse if not properly
treated, but failed to make such disclosures.

72. Defendants failed to notify state and governmental authorities of known
and suspected abuse when it was required by law they do so.

73. Defendants failed to provide reasonable supervision of its teachers,
supervisors, and staff in order to provide a safe environment.

74. Defendants failed to provide nutritious food, clothing, shelter, and
education, even though it represented to the Verneys that it was doing so.

75. Defendants were negligent by adopting and implementing programs,
regimens, and tactics specifically designed to induce anger, helplessness,
and worthlessness in Elizabeth and other inmates.

76. Defendants were negligent in their policy to have minors who had
advanced in the program to higher levels sometimes appointed to
indoctrinate and berate new or less advanced minors, while Defendants
knew and encouraged advanced level minors to psychologically, physically,
and verbally abuse other minors.

WHEREFORE, Plaintiffs pray for judgment as hereafter stated.

22

## FIFTH CAUSE OF ACTION

(Breach of Fiduciary Duty)

77. Plaintiffs incorporate herein all prior paragraphs and state:

78. The Ranch owed Elizabeth the highest duty of trust and confidence and was required to act in her best interest.

79. The Ranch's actions and inactions, described herein, in view of the high degree of control having been given by her parents, including full and complete custody over her, violated that relationship when they failed to act with the highest degree of trust and confidence to protect Elizabeth from physical, emotional and mental abuse.

80. Elizabeth, locked up at the Ranch, and disciplined severely for any minor infraction of mindless rules, was unable to care for or make decisions for herself, and, being entrusted to Ranch's care as a virtual prisoner, was owed a fiduciary duty.

81. By failing to take steps to prevent, detect, and minimize the harm from a round of daily abuse, the Ranch breached its fiduciary duty to Elizabeth.

WHEREFORE, Plaintiffs pray for judgment as hereafter stated.

## SIXTH CAUSE OF ACTION

### (Conspiracy and Fraudulent Concealment)

82. Plaintiffs incorporate herein all prior paragraphs and state that Defendants:

83. Fraudulently concealed the fact that the Ranch engaged in a pattern and practice of forcing Elizabeth to work several hours per day for the duration of her attendance without any compensation whatsoever.

84. Suppressed and minimized public knowledge of the rampant physical, emotional, mental, and gender abuse of Elizabeth by teachers, supervisors, and staff, and planned to take a uniform position and approach of denial as to the handling of reports of abuse.

85. The Ranch and its staff and employees fraudulently concealed by their web site, endorsements, and other means the fact that they have committed acts of negligence, gross negligence, misrepresentations, fraud and the other wrongful conduct described herein, and have engaged in concerted action to commit such wrongful acts.

86. In the absence of this concealment, public authorities, the media, and others would have issued general and specific warnings to the parents of children enrolled at the Ranch.

87. Had the Ranch not practiced concealment, and a proper warning been issued, the physical, emotional, mental, and sexual abuse would never have continued. Moreover, the theft of the value of Elizabeth's work, deprivation of her educational opportunities, and permanent damage to her future earning capacity, would not have occurred had a proper warning been issued. Thus, Defendants' actions in furtherance of this conspiracy to conceal are a proximate cause of the injury and damages herein.

88. As a part of their conspiracy to conceal the physical, mental, emotional, and sexual abuse of children by the offending teachers, supervisors, and staff, as well as the theft of the value of Elizabeth's work and her opportunity to receive even a minimally sufficient education, Defendants jointly followed a practice of refusing to stamp out suspected abuse despite actual notice and knowledge of the risk.

89. Defendants jointly concealed and failed to aggressively address abuse issues by such actions as failing to promulgate proper and effective policies for the appointment and training of teachers, supervisors, and staff.

90. The purpose of this conspiracy was to prevent criminal prosecution, avoid adverse publicity, prevent claims for damages by the numerous child

victims and their parents, and to avoid exposure of this conspiracy designed to conceal the claims arising from the conduct of these teachers, supervisors, and staff.

91. Further, the Enterprise, in furtherance of the overall conspiracy engaged in affirmative acts to conceal acts of fraud, breach of fiduciary duty, negligence, and gross negligence.

WHEREFORE, Plaintiffs pray for judgment as hereafter stated

### SEVENTH CAUSE OF ACTION

(Negligent Violations of International Standards of Care of Children)

92. Turn About Ranch was grossly negligent because it violated recommended standards of the rights of children, as set out in The Convention on the Rights of the Child, as adopted by the General Assembly of the United Nations in 1990.

93. The neglect and gross neglect acts to which Elizabeth was subject included the following:

a. She was negligently and intentionally separated from her parents against their respective wills, and without authority of judicial review.

b. In not permitting direct contact with one or both parents on a regular basis.

c. In refusing to consider Elizabeth's views in matters affecting her.

d. In not allowing Elizabeth freedom of expression by arbitrarily inferring with her privacy.

e. By subjecting Elizabeth to forms of physical and mental violence, injury and abuse, neglect or negligent treatment, and maltreatment.

f. By failing to identify, report, investigate, and follow up on the Ranch's maltreatment of Elizabeth.

g. By failing to provide adequate and special assistance to Elizabeth, who had emotional disabilities due to the Ranch's perverse treatment that was perpetrated by other and various forms of abusive maltreatment.

h. By failing to provide the highest attainable standards of health and facilities for Elizabeth's treatment and rehabilitation.

i. By failing to ensure provisions for necessary medical assistance and health care for Elizabeth and the other minors.

j. By failing to provide nutritious food and clean drinking water.

k. By failing to assure periodic reviews of the care being provided to Elizabeth and other minors.

l. By failing to recognize the right of every child to an education, regarding which Elizabeth was deprived while at the Ranch.

m. By failing to take measures to assure regular attendance at school.

n. By failing to administer school and educational discipline in a manner consistent with the Elizabeth's human dignity and in conformity with the "Convention on the Rights of the Child."

o. By failing to assure that Elizabeth's education was directed to the development of the her personality, talents, and mental and physical abilities to the fullest potential.

p. By failing to assure that the education given at the Ranch conformed to the minimum standards that were laid down by the standards of the State of Utah.

q. By failing to recognize Elizabeth's right to rest and leisure, to engage in play and recreational activities appropriate to her age, and to participate freely in cultural life, which, as a captive, she could not do.

r. By exploiting Elizabeth by requiring her to work at mindless chores that interfered with her education or were harmful to her physical health and mental, spiritual, moral and social development.

s. By subjecting Elizabeth to torture or other cruel, inhumane, or degrading treatment or punishment.

t. By depriving Elizabeth of her liberty unlawfully and arbitrarily.

u. By depriving Elizabeth of the right to maintain contact with her family, to correspondence and visits.

v. By failing to create an environment, which fostered Elizabeth's health, self-respect and dignity.

w. By failing to take appropriate measures to promote Elizabeth's physical and psychological recovery and social re-integration.

x. By failing to treat Elizabeth in a manner consistent with the promotion of her sense of dignity and worth, so as to reinforce her respect for human rights and the fundamental freedoms of others.

y. By directly and indirectly compelling Elizabeth to confess guilt, even to things she had not done, in order to satisfy her captors' demands and escape their taunting.

z. By failing to respect Elizabeth's privacy at all stages of her confinement.

94. Defendants perpetrated a breach of their duty toward Elizabeth and they were negligent and a proximate cause of the plaintiffs' damages.

95. The Defendants are jointly and individually liable for the neglect described.

WHEREFORE, Plaintiffs are entitled to judgment herein.

## EIGHTH CAUSE OF ACTION

(Actual and Constructive Fraud)

96. Plaintiffs incorporate by reference all of the above stated allegations and

state:

97. As fiduciaries of Elizabeth, Defendants, individually and collectively, owed

a duty to Elizabeth and her parents to inform them of the following facts:

(a) The Ranch was staffed by unqualified individuals;

(b) The Ranch did not contain sufficient staffing to prevent, detect,

and minimize the effects of incidents of abuse;

(c) The minors, including Elizabeth, were being used for child labor;

(d) The Ranch was below child safety standards that would

reasonably be anticipated;

(e) The education of their children would be minimal to non-

existent;

(f) Their children would not receive high school diplomas or

transferrable credits; and

(g) Their children would be harmed by the methods used to teach

and discipline their children.

98. None of the above disclosures was made to Elizabeth or her parents.

99. Because the stated adverse facts were true, relevant, and the Verneys

relied on the absence of these adverse facts, the Defendants had a duty to

disclose these conditions.

100.     By reason of the failure to make these disclosures to the Elizabeth and her parents, and their resulting detrimental reliance thereon, Defendants, individually and collectively, are guilty of actual and constructive fraud. The misrepresentations, and misrepresentations by silence were made to the Elizabeth and her parents from the beginning by phone conversations both before and throughout Elizabeth's period of time at the Ranch.

101.     These repeated intentional misrepresentations made by Defendants to the Elizabeth and her parents were done in order to induce them to place and maintain Elizabeth at the Ranch.

102.     Elizabeth's parents were lied to by the Defendants in promotional and marketing materials which represented the Ranch to be a safe and secure environment, where Elizabeth would be well cared for, and provided a good education, medical care, and therapy.  Defendants' representations were knowingly and actually false.

103.     Because all Defendants acted in concert, they are all liable for the misrepresentations alleged herein.

104.     Elizabeth and her parents relied on these representations to their detriment; Elizabeth was emotionally and physically harmed by the facilities and her parents were defrauded of money by paying several thousand dollars for what was represented to be quality care, services, and facilities, but such was never received by their Elizabeth.

105.     Upon information and belief, the Defendants and their agents

31

knew when they made these representations to the parents that they were false or at least misleading statements made to induce them to place and maintain Elizabeth at the Ranch in order to secure the monthly fees that the parents paid.

106.     Upon information and belief, the Defendants were aware that the facilities were not safe, the children were being harmed emotionally, physically, medically, and educationally, unqualified and masochistic staff.

107.     Upon information and belief, the Defendants were aware that the harm caused to children at these facilities, including Elizabeth, was so grave that the Utah Department of Human Services should have stepped in and shut down Turn About Ranch, but it did not.

## NINTH CAUSE OF ACTION

(Breach of Contract/Breach of Warranty)

108. Plaintiffs incorporate herein all the foregoing facts and allegations previously stated and state:

109. Defendants, operating jointly in a concert of action, referred to herein as the Ranch Enterprise, collectively induced parents to enter into contractual arrangements to place their children in the Ranch. The Defendants named herein accepted Elizabeth at the Ranch operated by them and collected payment from parents for school tuition, room and board, and "treatment

110.    Defendants did, by both their conduct and verbal statements, expressly and impliedly agree and warrant, in exchange for valuable consideration, to provide good quality child care, schooling, education, treatment, and boarding services in a safe, nurturing environment.

111.    Defendants promised that Elizabeth would, among other things, not be intentionally or negligently harmed, would receive an education, and would have improved emotional and psychological health, and would experience safe, professional, and positive treatment.

112.    Elizabeth's parents relied on the claims of Defendants that Elizabeth would be well cared for and properly educated in exchange for payments of money to the Ranch.

113.    Instead, Elizabeth was subjected to physical, mental, emotional, and verbal abuse as described herein, and was not provided an education.

114.    The Ranch breached its express and implied contract and warranty to Elizabeth and her parents.  As a result, Elizabeth and her parent Julia Gordon were damaged.

WHEREFORE, Plaintiffs pray for judgment as follows:

a.  The enforced release of any and all minors enrolled or incarcerated in

any and all of Defendants' facilities wherever located.

b.   Special damages according to proof.

b. General damages according to proof.

c. Punitive damages according to proof.

d.   Statutory penalties according to proof.

e. Attorneys fees according to proof.

f. The costs of suit.

g. Such other relief as is warranted.

Dated: June 18, 2012

Thomas M. Burton